753 F.2d 10
 James F. HEIMERLE, Plaintiff-Appellant,
v.
ATTORNEY GENERAL, United States of America, Director, United
States Bureau of Prisons, Warden, Federal Correctional
Institution, Otisville, New York, John Doe, Jane Doe,
Correctional Officers, Federal Correctional Institution,
Otisville, New York, John Doe, Jane Doe, Supervisory Staff,
Federal Correctional Institution, Otisville, New York,
Defendants-Appellees.
 No. 22, Docket 84-2037.
 United States Court of Appeals,
Second Circuit.
 Submitted Sept. 5, 1984.
Decided Jan. 15, 1985.
 
 James F. Heimerle, pro se.
 Rudolph W. Giuliani, U.S. Atty., Stephen A. Dvorkin, Jane E. Booth, Asst. U.S. Attys., New York City, submitted a brief for defendants-appellees.
 Before FEINBERG, Chief Judge, and LUMBARD and NEWMAN, Circuit Judges.
 JON O. NEWMAN, Circuit Judge:
 
 
 1
 This case concerns the circumstances under which prison officials may read a prisoner's correspondence with the outside world. James F. Heimerle brought this action to enjoin prison officials from reading his mail. Heimerle now appeals pro se from an order of the District Court for the Southern District of New York (Leonard B. Sand, Judge) denying his motion for judgment on the pleadings or for summary judgment and granting appellees' cross-motion for summary judgment. Heimerle v. Attorney General, 575 F.Supp. 1175 (S.D.N.Y.1983). For the reasons given below, we reverse and remand.
 
 Background
 
 2
 The issue in this case can best be understood against the background of the regulatory scheme of the Federal Bureau of Prisons concerning inmates' mail. 28 C.F.R. part 540, subpart B (1984). The regulations distinguish between "General Correspondence" and "Special Mail." The latter category, which is not at issue in this case, covers mail sent to and received from government officials and attorneys. 28 C.F.R. Sec. 540.2(c). All incoming general correspondence is opened and inspected for contraband and may be read by prison staff "as frequently as deemed necessary to maintain security or monitor a particular problem confronting an inmate." Id. Sec. 540.13(b).[1] Outgoing general correspondence from inmates in security level 4, 5, or 6 institutions (the three most secure of the Bureau of Prisons' six categories of prisons) may not be sealed by the inmate and may be inspected and read by prison staff. Id. Sec. 540.13(d). Outgoing general correspondence from inmates in security level 1, 2, or 3 institutions is normally sent unopened and uninspected but may be opened under certain specified conditions.[2] Id. Sec. 540.13(c). Outgoing special mail is not subject to inspection. Id. Sec. 540.17(c). Incoming special mail may be opened in the presence of the inmate and inspected for contraband, but the correspondence may not be read. Id. Sec. 540.17(a).
 
 
 3
 Appellant is a federal prisoner at the Federal Correctional Institution at Otisville, New York ("Otisville"). In September 1982, Heimerle filed a complaint pro se to enjoin appellees from reading and censoring his personal correspondence. Thereafter the District Court granted Heimerle's application for the appointment of counsel and denied, without prejudice, his request for preliminary injunctive relief. Judge Sand also denied the appellees' motion to dismiss for failure to state a claim on which relief could be granted, except to the extent that it related to Heimerle's allegations of censorship by prison authorities. Heimerle v. Attorney General, 558 F.Supp. 1292 (S.D.N.Y.1983).
 
 
 4
 In June 1983, Heimerle filed an amended complaint, prepared with the assistance of appointed counsel. The amended complaint abandoned the censorship claim and sought an injunction to prevent appellees from violating Heimerle's First Amendment rights by reading his general correspondence, both incoming and outgoing. Thereafter Otisville was reclassified from security level 4 to security level 3. As a result of the change, Heimerle's outgoing general correspondence was no longer subject to routine reading by prison staff, 28 C.F.R. Sec. 540.13(c), though his incoming general correspondence remained subject to reading by prison staff whenever "deemed necessary to maintain security or monitor a particular problem confronting an inmate," id. Sec. 540.13(b).
 
 
 5
 The District Court decided the case on cross-motions for summary judgment. Heimerle v. Attorney General, supra, 575 F.Supp. at 1175. Judge Sand ruled as a preliminary matter that the reduction in Otisville's security level rendered moot Heimerle's claim regarding outgoing mail. Id. at 1177. With regard to incoming mail, the District Court granted summary judgment in favor of appellees. Id. at 1177-79. On this appeal, Heimerle challenges only the District Court's ruling upholding the routine reading of incoming general correspondence.
 
 Discussion
 
 6
 The law concerning prisoners' correspondence has been significantly altered since we ruled in 1971 that "prison officials may open and read all outgoing and incoming correspondence to and from prisoners." Sostre v. McGinnis, 442 F.2d 178, 201 (2d Cir.1971) (in banc), cert. denied, 405 U.S. 978, 92 S.Ct. 1190, 31 L.Ed.2d 254 (1972). The erosion of this aspect of Sostre began with the Supreme Court's decision in Procunier v. Martinez, 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974). The Court there affirmed the invalidation on First Amendment grounds of state prison regulations giving prison staff broad discretion to censor incoming and outgoing prisoner mail. Noting that prison interference with prisoner mail implicates not only the rights of prisoners but also the rights of all members of the public who wish to communicate with prisoners, id. at 408-09, 94 S.Ct. at 1808-09, the Court set forth a two-pronged test for reviewing prison censorship of inmate correspondence. The challenged practice must further "one or more of the substantial governmental interests of security, order, and rehabilitation," id. at 413, 94 S.Ct. at 1811, and it must not be "greater than is necessary or essential to the protection of the particular governmental interest involved," id.
 
 
 7
 Though the Supreme Court noted later in the 1973 Term that "freedom from censorship is not equivalent to freedom from inspection or perusal" of prisoner mail, Wolff v. McDonnell, 418 U.S. 539, 576, 94 S.Ct. 2963, 2984, 41 L.Ed.2d 935 (1974), challenges to the reading of prisoner mail were subsequently considered and upheld by this Court in light of the ruling in Martinez. The principal challenge occurred in the well-known litigation concerning various practices at the Metropolitan Correctional Center (MCC) in Manhattan. In United States ex rel. Wolfish v. United States, 428 F.Supp. 333 (S.D.N.Y.1977), Judge Frankel's broad ruling included a provision restricting the authority of prison officials to read both outgoing and incoming prisoner mail except upon a showing of good cause. Id. at 343-44.[3] This Court affirmed that portion of the District Court's order, applying to the reading of prisoner mail the same First Amendment analysis that the Supreme Court had applied in Martinez to the censorship of such mail. Wolfish v. Levi, 573 F.2d 118, 130-31 (2d Cir.1978). As Judge Kaufman observed, "It cannot be gainsaid that the reading of mail by jail officials chills the expression of first amendment rights by correspondents inside and outside the institution." Id. at 130. Though there are references in Judge Kaufman's opinion to outgoing mail, id. at 130 & n. 27, the order appealed from plainly applied to both incoming and outgoing mail, 428 F.Supp. at 343, 344, and the opinion affirming the mail provision of the order explicitly recognizes the importance of protecting the inmate's right "to receive and send mail." 573 F.2d at 130.[4] The Supreme Court's reversal of portions of Judge Frankel's order left the mail provision undisturbed, Bell v. Wolfish, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979); the Government did not challenge this provision in the Supreme Court. Brief for Petitioners, Bell v. Wolfish, supra.
 
 
 8
 Subsequently, in Davidson v. Scully, 694 F.2d 50 (2d Cir.1982), a case challenging prison restrictions on outgoing prisoner mail, we recognized that the authority of Sostre had been eroded by Martinez and Wolfish, id. at 50, and observed that "evanescent security interests" do not "justify 'infringement of so basic a right' as the 'right to receive and send mail.' " Id. at 53 (citing Wolfish v. Levi, supra, 573 F.2d at 130-31).[5]
 
 
 9
 Heimerle acknowledges that the justifications for reading and for inspecting incoming prisoner mail are entirely different. Recognizing that incoming mail may properly be inspected to detect contraband, Heimerle challenges the incoming mail regulation only to the extent that it authorizes prison staff routinely to read such mail. As previously noted, the regulation authorizes such reading "as frequently as deemed necessary" for two purposes: to maintain security and to monitor a particular problem confronting an inmate. 28 C.F.R. Sec. 540.13(b). No issue has been raised in this case concerning the reading of Heimerle's incoming mail in order to "monitor a particular problem confronting" this inmate. The justification advanced by the Bureau of Prisons and accepted by the District Court concerned only maintenance of security. In the District Court, Heimerle challenged this justification on two grounds. First, he contended that the security interest was not bona fide because, he alleged, the staff at Otisville does not monitor the contents of communications conveyed to prisoners in social visits, a contention that the appellees dispute, see Heimerle v. Attorney General, supra, 575 F.Supp. at 1178. Second, he contended that even a bona fide security interest could not justify the chilling effect upon communication that results from random reading of prisoner mail.
 
 
 10
 Mindful of the cautions expressed by the Supreme Court concerning judicial assessment of prison regulations designed to achieve legitimate objectives of a corrections system, see, e.g., Jones v. North Carolina Prisoner's Union, 433 U.S. 119, 125-26, 97 S.Ct. 2532, 2537-38, 53 L.Ed.2d 629 (1977); Pell v. Procunier, 417 U.S. 817, 822-23, 94 S.Ct. 2800, 2804-05, 41 L.Ed.2d 495 (1974); Procunier v. Martinez, supra, 416 U.S. at 412-14, 94 S.Ct. at 1810-12, we think it inappropriate to determine the proper construction of the incoming mail regulation and surely not its constitutionality until the factual dispute concerning prison monitoring practices has been resolved. The District Judge concluded that he could uphold the regulation even accepting Heimerle's contention that social visits are not monitored. 575 F.Supp. at 1178. Judge Sand reasoned that the choice of monitoring techniques was within the discretion of the prison administrators and that the first part of the Martinez test was satisfied so long as the challenged practice "furthers a plausible security interest in a rational way." Id. Though we agree that prison administrators have considerable discretion in their choice of security measures, we have previously ruled that the choice they make is relevant to a court's assessment of the substantiality of the reasons claimed to justify their action. In Wolfish v. Levi, supra, we characterized a claim of security, advanced to justify reading of prisoner mail, as "spurious" where "social visits and telephone calls are left unmonitored." 573 F.2d at 130. This point was restated in Davidson v. Scully, supra, 694 F.2d at 54. See also Procunier v. Martinez, supra, 416 U.S. at 425, 94 S.Ct. at 1817 (Marshall, J., concurring); Martino v. Carey, 563 F.Supp. 984, 1005 n. 16 (D.Ore.1983); but see Feeley v. Sampson, 570 F.2d 364, 374 (1st Cir.1978).
 
 
 11
 Bureau of Prisons' regulations authorize prison staff to "supervise each inmate visit to prevent the passage of contraband and to ensure the security and good order of the institution." 28 C.F.R. Sec. 540.51(g). Monitoring of telephone conversations, with notice of the likelihood of such monitoring, is authorized "to preserve the security and orderly management of the institution and to protect the public." Id. Sec. 540.101. Without some understanding as to the general degree to which monitoring of telephone calls and social visits occurs at Otisville, we are left with an inadequate basis to determine whether the routine reading of incoming prisoner mail advances a significant security interest, as appellees contend, or a "spurious" interest, as was the case in Wolfish. The grant of summary judgment to the appellee has precluded that determination.
 
 
 12
 Upon remand, we do not expect a detailed inquiry into all the particulars of telephone and social visit monitoring at Otisville. Prison authorities need not compromise security in order to demonstrate the need to maintain it. But there must be sufficient exploration of the extent of current practices to provide a basis for assessing the substantiality of the security interest alleged to justify whatever degree of reading of incoming mail is occurring. With respect to a security level 3 institution like Otisville, that assessment must also include some consideration of whether a bona fide security interest is advanced by routinely reading incoming general correspondence when outgoing general correspondence is read only in limited circumstances. It is at least arguable that communications prejudicial to prison security, such as plans for escape or for obtaining contraband, are as likely to be contained in outgoing letters as in incoming letters.
 
 
 13
 Accordingly, we reverse and remand for further proceedings.
 
 
 
 [1]
 Inmates are obliged to "consent" to the reading of their incoming general correspondence as a condition of receiving such mail. Upon arrival at an institution, they are asked to sign one of two alternative forms: One authorizes prison staff to read incoming general correspondence; the other instructs prison staff to return such mail to postal authorities unopened. If the prisoner declines to sign either form, he is deemed to have authorized the reading of his incoming general correspondence. 28 C.F.R. Sec. 540.11(b)
 
 
 [2]
 28 C.F.R. Sec. 540.13(c) provides:
 Outgoing mail in Security Level 1, 2, 3, and of pre-trial detainees in all institutions may be sealed by the inmate and is sent out unopened and uninspected. Staff may open an inmate's outgoing general correspondence:
 (1) If there is reason to believe it would interfere with the orderly running of the institution, that it would be threatening to the recipient, or that it would facilitate criminal activity;
 (2) If the inmate is on a restricted correspondence list; or
 (3) If the correspondence is between inmates. (See Sec. 540.16)
 
 
 [3]
 "The court will order that petitioners be freed to seal outgoing mail, subject only to (a) inspection by electronic or other devices to detect hidden objects, without opening the letters, and (b) the power to read contents, in the sender's presence, upon a showing of good cause." 428 F.Supp. at 343. "[T]he court will order that (a) non-legal mail addressed to petitioners at the MCC may be opened and searched for contraband, (b) without probable cause or the recipient's presence, but (c) with the firm understanding, to be enforced with rigor, that the contents are not to be read, except on a showing of good cause, and then only in the recipient inmate's presence." Id. at 344
 
 
 [4]
 We therefore disagree with the view that our Wolfish decision allowed incoming mail to be "routinely read," an interpretation that has been made in the Southern District, Golden v. Coombe, 508 F.Supp. 156, 160 (S.D.N.Y.1981), and apparently adopted by the District Court in this case, 575 F.Supp. at 1178
 
 
 [5]
 Though the opinion in Davidson at one point characterized our decision in Wolfish as upholding a lower court order prohibiting prison officials, without good cause, from reading "outgoing" mail, 694 F.2d at 54, that description was a correct statement of the aspect of the Wolfish order that was relevant to the Davidson appeal, which concerned only outgoing mail; we do not understand the characterization to have limited the Wolfish order, or our affirmance of it, to outgoing mail